**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **OSCAR GARCIA and** | § | |
| **CATHERINE GARCIA, Individually** | § | |
| **and as Representatives of the Estate of** | § | |
| **ALEXANDER GARCIA,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **NORTHSIDE INDEPENDENT** | § | **SA-05-CA-0218 FB (NN)** |
| **SCHOOL DISTRICT and** | § | |
| **JANE WILSON,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    **Hon. Fred Biery**
       **United States District Judge**

The matters before the Court are defendants' motion for reconsideration (docket entry # 58) and motion for summary judgment (docket entry # 60).   These motions were filed on March 24, 2006, and March 27, 2006, respectively.   The motion for reconsideration asks the District Court to reconsider the denial of an earlier motion to dismiss for lack of subject matter jurisdiction.   Previously, I indicated that I would consider the motion to reconsider as part of my consideration of the defendants' motion for summary judgment.[1]   After considering the motions, I recommend summary judgment in favor of defendants on plaintiffs' remaining federal claim and the exercise of supplemental jurisdiction over plaintiffs' state-law claims.

**Factual Background**

---

[1]*See* docket entry # 62.

This action arises out of events that occurred while plaintiff-decedent Alexander Garcia was a student at Sandra Day O'Connor High School located in the Northside Independent School District (NISD). Alexander was fourteen years old at the time of the events that gave rise to this lawsuit. Defendant Jane Wilson was employed as the school nurse at Sandra Day O'Connor High School.

In their original complaint, Alexander's parents—plaintiffs Oscar and Catherine Garcia—alleged that Alexander had been diagnosed with severe asthma since the approximate age of 18 months and received intensive medical treatment for this condition throughout his life. According to the plaintiffs' complaint, Catherine Garcia enrolled Alexander at Sandra Day O'Connor High School on August 27, 2003. At that time, Catherine Garcia provided several documents to the school employees. These documents included: a "Physician/Parent Request for Administration of Medicine/Special Procedure by School Personnel," a "Daily Treatment Plan," and "School Asthma Action Plan." The documents instructed that "Alexander must carry his inhaler at all times."

Plaintiffs allege they were not offered an opportunity for a restricted physical education class to accommodate Alexander's asthma condition, and he was, instead, enrolled in a regular physical education class without any modifications to the curriculum. Plaintiffs allege defendants did not provide the instructor of Alexander's physical education class with information regarding his asthmatic condition or about the requirement that Alexander carry his inhaler at all times. Because Alexander's physical education uniform did not have pockets, plaintiffs allege Alexander left his inhaler in his locker during the class time; the lockers were located inside a locked cage.

On September 16, 2003, Alexander participated in his physical education class, which began with a stretching and warm-up routine inside an air conditioned gym. This routine consisted of jumping jacks, push-ups, and sit-up exercises. Alexander exhibited no distress prior to or during this exercise. Following this warm-up routine, Alexander's class went outside to run on the track, where students were required to walk for two minutes and then run for two minutes.[2] During this running routine, Alexander began to experience problems breathing. Alexander's instructor accompanied him back to the gym; however, Alexander collapsed before reaching the building. Resuscitation efforts were unsuccessful. Alexander was pronounced dead at Methodist Children's Hospital on the afternoon of September 16, 2003. Asthma was determined to be the cause of death.

## Procedural Posture of the Case

Originally, plaintiffs filed their complaint against NISD, Donald Moecker, Jane Wilson, Lisa Baker, and Alma Linares. Plaintiffs alleged that defendants discriminated against Alexander on the basis of his disability—asthma—in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504). In addition, plaintiffs alleged defendants violated 42 U.S.C. § 1983 by depriving Alexander of his right to bodily integrity as secured under the United States Constitution and by acting with conscious indifference to deprive him of his rights secured under Section 504. Finally, plaintiffs alleged defendant Wilson committed negligence and gross negligence by failing to inform Alexander's instructors about Alexander's asthma, failing to evaluate Alexander's condition for possible special education, and failing to meet Alexander's

---

[2]Plaintiffs allege NISD had been informed that this particular day was an "air quality health alert day;" however, Alexander's instructor was not provided this information.

health needs.

On April 20, 2005, plaintiffs filed a notice of dismissal of all claims asserted against Lisa Baker and Alma Linares.   Subsequently, NISD, Moecker, and Wilson filed motions to dismiss.  I prepared an Memorandum and Recommendation on those motions and recommended granting NISD's motions to dismiss for failure to state a claim, granting the motions filed by defendant Moecker and Wilson, and denying defendants' motion to dismiss for lack of subject matter jurisdiction.[3]  The District Court accepted the recommendations and dismissed the following claims: (1) plaintiffs' claim under 42 U.S.C. § 1983 that NISD acted with conscious indifference to deprive Alexander of his rights secured under Section 504, (2) plaintiffs' claim under 42 U.S.C. § 1983 that NISD deprived Alexander's constitutional right to bodily integrity, and (3) plaintiffs' claims under 42 U.S.C. § 1983 against Moecker and Wilson.[4]  The District Court also determined that the exhaustion requirement set forth in Section 22.0514 of the Texas Education Code did not apply to  the plaintiffs' claims against Wilson.[5]  Consequently, the following claims remain unresolved: (1) plaintiffs' Section 504 claim against NISD that Alexander was subjected to invidious discrimination on the basis of his disability, and (2) plaintiffs' negligence and gross negligence claims against Wilson.  Defendants' motion for summary judgment and this Memorandum address those claims.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and the District Court's Order referring all pretrial matters to me.

---

[3]*See* docket entry # 48.

[4]*See* docket entry # 56.

[5]*See id.*

## Standard for Summary Judgment

A defendant in a civil action may move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure at any time.[6]  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[7]

## Plaintiffs' Section 504 Claim

In their motion for summary judgment, defendants maintain NISD is entitled to summary judgment on plaintiffs' Section 504 claim because plaintiffs cannot show that Alexander was disabled.  Defendants contend that plaintiffs have failed to present summary judgment evidence that raises a fact question about whether Alexander was substantially limited in the major life activity of breathing and thus have not shown that Alexander was disabled.

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of . . . his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."[8]  To make out a prima facie case of discrimination under Section 504, a plaintiff must show that (1) he is an individual with a disability under the act, (2) he is otherwise qualified for the benefits sought, (3) he was discriminated against solely by the reason of his disability, and

---

[6]Fed. R. Civ. P. 56.

[7]*Id.*

[8]29 U.S.C. § 794(a).

(4) the defendant program or activity receives federal funding.[9]  The regulations implementing Section 504 define an individual with a disability as "any person who . . . has a physical or mental impairment which substantially limits one or more major life activities. . . ."[10]  The regulations define "physical or mental impairment" as follows:

> (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.[11]

The parties do not dispute that Alexander's asthma constitutes a physical impairment.  The

---

[9]*See* 29 U.S.C. § 794(a) (providing that qualified individuals with a disability shall not be denied benefits based solely on that disability)*; Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 676 n.8 (5th Cir. 2004) (noting in a case challenging public transportation services that the prima facie case for a claim under the Rehabilitation Act is operationally the same as the prima facie case under the Americans with Disabilities Act (ADA)); *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997) (explaining that visually impaired and mobility impaired plaintiffs who complained that they were denied access to polling sites and voting procedures must show that (1) they are qualified individuals under the ADA; (2) they are being excluded from participation in, or being denied benefits of, services, programs, or activities for which the defendant is responsible, or are otherwise being discriminated against by the defendant; and (3) that such exclusion, denial of benefits, or discrimination is by reason of their disability).  *See also Kelly v. Boeing Petroleum Services*, 61 F.3d 350, 365 (5th Cir. 1995) (setting out the elements of a prima facie case under the Rehabilitation Act in an employment discrimination case ).

[10]34 C.F.R. § 104.3(j)(1) (defining handicapped person for the purpose of Section 504).  Section 504 actually refers to the definition of "individual with a disability" as defined in 29 U.S.C. § 705(20).  That definition refers specifically to an individual who "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment. . . ."  29 U.S.C. § 705(20).  The regulations for the implementation of Section 504 provide a more general definition that covers more than disabled employees.

[11]34 C.F.R. § 104.3(j)(2)(I).

regulations specify "breathing" as a major life activity.[12]  In this case, plaintiffs maintain that Alexander's asthma substantially limited his breathing.  The defendants, however, maintain that the summary judgment evidence does not raise a fact question about whether Alexander's asthma substantially limited his breathing.  Instead, the defendants argue that the plaintiffs' depositions indicate that Alexander was not disabled under Section 504.

The United States Court of Appeals for the Fifth Circuit has indicated that case law interpreting the Americans with Disabilities Act (ADA) is relevant to cases under Section 504.[13] Relevant here is the Supreme Court's decision in *Sutton v. United Air Lines*.[14]  In *Sutton*, the Supreme Court considered a claim brought under the ADA and determined that "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment . . . ."[15]  In making this determination, the Court stated that "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."[16] The Court explained that "a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not

---

[12]*See* 34 C.F.R. § 104.3(j)(2)(ii).

[13]*See Delano-Pyle v. Victoria County, Tex*., 302 F.3d 567, 574 (5th Cir. 2002) (explaining that jurisprudence interpreting either the ADA or Section 504 is applicable to both statutes).

[14]527 U.S. 471 (1999).

[15]*Sutton*, 527 U.S. at 475.

[16]*Id.* at 482-83.

'substantially limi[t]' a major life activity."[17]   The Court also explained that the determination of whether an individual is disabled is an individualized inquiry, based on whether the impairment substantially limits the "major life activities" of the particular person.[18]   Defendants rely on the depositions of Alexander's parents—plaintiffs in this case—to support their argument that an individualized inquiry shows that Alexander's breathing was not substantially impaired.

In her deposition, Catherine Garcia described Alexander as an active child who was diagnosed with asthma when he was about 18 months old.  Catherine characterized Alexander as a good-natured child who liked to play jokes on his friends and family.  Catherine testified that although Alexander had to carry his inhaler at all times, he still participated in karate, bicycle riding, skateboarding, motorcycle riding, swimming, playing outdoors, and traveling—including out-of-country trips.  Catherine explained that Alexander experienced periodic asthmatic flare-ups, but Alexander's breathing difficulties were controlled using a nebulizer and an inhaler. When questioned specifically about what evidence indicated the defendants had discriminated against Alexander because of his asthma, Catherine stated that she was not sure that they had. Although she complained during her deposition that Alexander should have not been required to participate in outdoor physical education, she admitted that she permitted him to play outdoors—routinely and unsupervised—and that none of Alexander's doctors had recommended that Alexander be restricted to indoors.  This evidence supports the defendants' position that no evidence exists to demonstrate that Alexander was disabled under Section 504 because it shows that Alexander's asthma was corrected by a mitigating measure—the use of his inhaler—and that

_____

[17]*See Sutton*, 527 U.S. at 483.

[18]*See id.*

in its mitigated state, Alexander's asthma did not substantially limit his breathing.  The evidence shows that in its mitigated state, Alexander's breathing was regulated to such a degree that he succeeded in school, played with friends like a normal child, and participated in a wide range of physical activities.

In his deposition, Oscar characterized his son as a really cool kid who was easy to get along with and very determined in whatever he choose to do.  He confirmed Catherine's testimony about Alexander's early diagnosis of asthma and testified that Alexander controlled his breathing difficulties with medication—a nebulizer and an inhaler.  He explained that Alexander's asthma was acute and could flare-up without warning.  In his testimony, Oscar described the wide range of outdoor activities in which Alexander participated—karate, bike riding, skateboarding, motorcycle riding, camping, hunting, fishing, shredding fields using a tractor, hiking, and traveling—including out-of-country trips.  Oscar stated that Alexander was a good student, but that he could not participate in team sports because he got winded too easily. When questioned about the need for a restricted physical education class, Oscar stated that he did not think that Alexander needed a restricted class.  He also testified that he did not believe that Alexander had been discriminated against on the basis of his asthma.  Like Catherine's deposition, this evidence supports the defendants' position that no evidence exists that Alexander was disabled under Section 504 because it shows that Alexander's asthma was corrected by a mitigating measure—the use of his inhaler—and that in its mitigated state, Alexander's asthma did not substantially limit his breathing.  The evidence shows that in its mitigated state, Alexander's breathing was controlled to such a degree that he succeeded in school, played with friends like a normal child, and participated in a wide range of physical activities.  Thus, the

defendants are entitled to summary judgment unless the plaintiffs present evidence that raises a

fact question about whether Alexander was disabled.

In response, plaintiffs first argue that the use of mitigating measures is irrelevant to the

determination of whether Alexander was disabled under Section 504.  Plaintiffs rely on two

documents to support their argument: (1) instructions provided by the Equal Employment

Opportunity Commission (EEOC) to its field agents about ADA investigations,[19] and (2) an

analysis of the effect of *Sutton* on the consideration of mitigating factors by the United States

Department of Education's Office of Civil Rights (OCR).[20]  These documents were responses to

*Sutton*.  There are two reasons why these documents do not make the use of Alexander's inhaler

irrelevant.  The first reason is that the documents do not create an exception for the specific

moment in time when Alexander died.  A summary of those documents shows why.

The EEOC instructions summarize what were then recent Supreme Court decisions about

the ADA.  The instructions modified previous instructions for investigating ADA claims which

did not consider mitigating measures in determining whether a charging party has a disability as

defined by the ADA and emphasized the individualized analysis required under *Sutton*.  The

instructions advised field investigators that under *Sutton*, "a person who experiences no

substantial limitation in any major life activity when using a mitigating measure does not meet

the ADA's first definition of 'disability' (a physical or mental impairment that substantially

_____

[19]*Instructions for Field Offices: Analyzing ADA Charges after Supreme Court Decisions Addressing "Disability" and "Qualified"* (Dec. 13, 1999), http://www.eeoc.gov/policy/docs/field-ada.html.

[20]Sutton *Investigative Guidance: Consideration of "Mitigating Measures" in OCR Disability Cases* (Sept. 29, 2000), http://www.diabetes.org/uedocuments/Sutton_Investigative_Guidance.pdf.

limits a major life activity)."[21]  The instructions further advised that under *Sutton*, "the

determination of whether a person has a 'disability' **must be made on a case-by-case basis**."[22]

The instructions explained that *Sutton* emphasized that "the disability determination must be

based on a person's **actual condition at the time of the alleged discrimination**."[23]  The

instructions directed field investigators as follows:

> Therefore, if a [charging party] did not use a mitigating measure at that time, an
> Investigator must determine whether s/he was substantially limited in a major life
> activity based solely on his/her actual condition.  *For the purpose of determining
> whether a [charging party] meets the definition of "disability," speculation
> regarding whether the person would have been substantially limited if s/he used a
> mitigating measure is irrelevant.*[24]

Plaintiffs rely on the italicized language to support their position that Alexander's use of

medication is irrelevant to determining whether Alexander was disabled.  According to plaintiffs,

the use of the inhaler is irrelevant because Alexander was unable to access his inhaler at the time

of the alleged discrimination.  Plaintiffs state their argument in terms of "the time of the alleged

discrimination" because the EEOC instructions refer to the mitigating measures used at "the time

of the alleged discrimination."

The OCR issued similar guidance in its role as an enforcement agency for Section 504

and for Title II of the ADA which extends the ADA's prohibition against discrimination to public

---

[21]*Instructions for Field Offices: Analyzing ADA Charges after Supreme Court Decisions
Addressing "Disability" and "Qualified"* (Dec. 13, 1999), http://www.eeoc.gov/policy/docs/field-ada.html.

[22]*Id*. (emphasis in the original).

[23]*Id*. (emphasis in the original).

[24]*Id*. (emphasis added).

schools.  The guidance recognized that prior to *Sutton*, "the federal government's position (and the position of most appellate courts) was that the effect of mitigating measures should not be taken into account when determining whether a person had a disability."[25]  The instructions explained that under *Sutton*, "[t]he determination of disability must be made on the basis of an individualized inquiry," and that after *Sutton*, "you must consider how that person functions in caring for himself or herself **with** the medication that he or she is taking."[26]  As a result, the instructions directed OCR enforcement officers as follows:

> Note that only mitigating measures that a student was actually using at the time of the alleged discrimination are relevant.  The Supreme Court decision[] in *Sutton* . . . do[es] not require people with impairments to use mitigating measures to try to limit the effects of their impairments.  If a student was using one or more mitigating measures at the time of the alleged discrimination, the effects of that mitigating measure (or measures) are relevant.  If a student was not using a mitigating measure, then the effects a particular mitigating measure might have had, if that student had used it, are speculative and irrelevant.

Plaintiffs rely on this additional language to support their position that Alexander's use of medication is irrelevant in determining whether Alexander was disabled, arguing that Alexander's inhaler was unavailable at the time of the alleged discrimination.

Standing alone, the relied-upon language seems to support plaintiffs' position that Alexander's use of his inhaler is irrelevant because Alexander did not have his inhaler when he began to experience breathing problems on the day he died.  But read as part of the EEOC guidance and as part of the OCR's implementing instructions for the decision in *Sutton*, the language does not support their argument.  Read in their entirety, the guidance and instructions

---

[25]Sutton *Investigative Guidance: Consideration of "Mitigating Measures" in OCR Disability Cases* (Sept. 29, 2000), http://www.diabetes.org/uedocuments/Sutton_Investigative_Guidance.pdf.

[26]*Id*. (emphasis in the original).

12

mirror *Sutton's* reasoning and recognize that *Sutton* does not require a person to use mitigating measures in order to be considered disabled.

In *Sutton*, the Supreme Court explained why the use of mitigating measures must be considered in determining whether a person is disabled. The Court explained as follows:

> A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.[27]

The Supreme Court explained that the EEOC's guidance for determining whether a person was disabled contradicted the ADA's mandate for an individualized inquiry because the guidance directed that "persons be judged in their uncorrected or unmitigated state."[28] The Supreme Court explained that the EEOC's "approach would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition."[29] The Court concluded by determining that an individualized inquiry—"with reference to corrective measures"[30]—is required.

---

[27]*Sutton*, 527 U.S. at 482-83.

[28]*Id.* at 483.

[29]*Id*.

[30]*Id.* at 488.

By requiring an individualized inquiry, the Supreme Court directed courts to consider the "use" of mitigating measures in determining whether a person is disabled, but it warned courts about speculating about corrective measures.  In doing so, the Court prohibited courts from considering the "availability" of mitigating measures in determining whether a person is disabled—because that consideration requires speculation about the effect of mitigating measures.  Instead, the Court required courts to consider the "use" of mitigating measures.  Thus, under *Sutton*, the determination of whether an impairment substantially limits a major life activity must be made with regard to the "use" of mitigating measures, but without regard to the "availability" of mitigating measures.  Logically then, determining whether a person who does <u>not</u> use mitigating measures is disabled must be made <u>without</u> reference to mitigating measures.

The EEOC post-*Sutton* instructions reflect this logic by instructing field investigators to determine whether a charging party who does not use a mitigating measure is substantially limited in a major life activity based solely on the party's actual condition at the time of the alleged discrimination.  The instructions further reflect the logic by instructing investigators that speculation about whether the person would be substantially limited if he used a mitigating measure is irrelevant in determining whether the person is disabled.  Prior to *Sutton*, the EEOC instructions precluded investigators from considering mitigating measures at all, and hence, the post-*Sutton* instructions state that the instructions modify previous instructions and instructs investigators to consider mitigating measures used by charging parties.  Read in this context, the particular language plaintiffs rely upon—"For the purpose of determining whether a [charging party] meets the definition of "disability," speculation regarding whether the person would have been substantially limited if s/he used a mitigating measure is irrelevant."—does not carve out an

14

exception for a particular point in time when a person does use a mitigating measure, but rather recognizes that a person is not required to use a mitigating measure in order to be considered disabled.  Accordingly, the EEOC instructions tell investigators not to consider mitigating measures that a charging party does not use because they are irrelevant.

The OCR guidance reflects the same logic by directing OCR enforcement officers not to consider medication a student does not use.  The guidance follows:

> Consider only those mitigating measures the student was actually using at the time of the alleged discrimination.  Do not speculate about what the student could have done if he . . . had been using the mitigating measures, or had been using different mitigating measures. . . . In addition, even if the student had medication but was not using it, do not consider what the student could have done if he . . . had been taking his . . . medication.

This guidance represented a change in how OCR enforcement officers conducted their investigations before *Sutton*; the guidance states that "the *Sutton* . . . decision[] . . . [has] changed the standard used in determining whether a student has a disability when that issue arises."  The guidance explained that *Sutton* does not "require people with impairments to use mitigating measures to try to limit the effects of their impairments."  Thus, the guidance requires enforcement officers to consider only "those mitigating measures the student was actually using at the time of the alleged discrimination."  Like the language in the EEOC instructions, the particular language plaintiffs rely on—"If a student was not using a mitigating measure, then the effects a particular mitigating measure might have had, if that student had used it, are speculative and irrelevant."—recognizes that *Sutton* does not require a student to use a mitigating measure. It does not carve out an exception for a specific point in time when a student does not use his medication.

15

The EEOC instructions and the OCR guidance distinguish between the consideration of the "use" of mitigating measures and the consideration of the "availability" of mitigating measures.  The EEOC Compliance Manual echoes this distinction.  The manual recognizes the distinction by stating, "the extent to which the impairment limits the individual's major life activities should be assessed without regard to the <u>availability</u> of mitigating measures."[31]

Applying that distinction here, Alexander's use of his medication is relevant to determining whether he was disabled because no fact question exists that Alexander used his medication.  The summary judgment evidence is uncontradicted:  Alexander used his inhaler to control his asthmatic flare-ups.  Catherine and Oscar testified that Alexander carried his inhaler at all times.  By using his inhaler, Alexander controlled his asthma so that his asthma did not substantially limit his breathing.  The evidence shows that in its mitigated state, Alexander's breathing was controlled to such a degree that Alexander succeeded in school, played outdoors with friends, and participated in a wide range of physical activities.

The second reason the EEOC instructions and the OCR guidance do not make the use of Alexander's inhaler irrelevant is that "the time of the alleged discrimination" is a broader time period than defined by plaintiffs.  Plaintiffs define "the time of the alleged discrimination" as the time of Alexander's death.  Plaintiffs' allegations, however, define at least twenty consecutive days as "the time period of the alleged discrimination"—from the day Catherine enrolled Alexander in O'Connor High School until the day Alexander died.  Specifically, plaintiffs complain that they were not offered an opportunity for a restricted physical education class to accommodate Alexander's asthma, defendants did not inform Alexander's physical education

---

[31]EEOC COMPLIANCE MANUAL § 902.5 (emphasis added).

instructor about his asthma, and the school provided Alexander with a gym uniform without a pocket in which he could carry his inhaler.  These allegations apply to the 20 days during which Alexander attended O'Connor High School—not to the moment of Alexander's death. According to the allegations, the time of the alleged discrimination is the 20-day time period Alexander attended O'Connor High School.

The summary judgment evidence shows that the inhaler was available to Alexander during the time of the alleged discrimination and no evidence indicates the defendants prevented Alexander from using his inhaler.  Plaintiffs do not complain that the defendants prohibited Alexander from carrying his inhaler.  They do not suggest that Alexander was prevented from wearing a gym uniform with a pocket or from carrying his inhaler using a fanny pack, wristband, neck strap, or some other type of carrying device.  Plaintiffs do not maintain that Alexander's instructor prevented Alexander from carrying his inhaler to the field on the day that he died. Where no evidence suggests the defendant prevented Alexander from carrying his inhaler, the fact that the inhaler was not available to him at the specific time he died does not make the use of his inhaler irrelevant.

The plaintiffs argue that even with the consideration of mitigating measures, the summary judgment evidence raises a fact question about whether Alexander was disabled.  Plaintiffs rely on deposition testimony from Alexander's doctors: Dr. Barbara Belcher—Alexander's primary treating physician—and Dr. Victor Estrada—Alexander's allergist.

Dr. Belcher began caring for Alexander when he was three years old.  She last saw Alexander on February 12, 2001—approximately two years and seven months prior to Alexander's death.  Dr. Belcher testified that at that time, she considered Alexander capable of

engaging in a school physical education class with the use of an inhaler.  When cross-examined about whether an asthmatic child should participate in physical education, Dr. Belcher answered that she thought all children should participate in physical education, but that an asthmatic child should not participate if he was wheezing.  Dr. Belcher characterized Alexander's asthma as "extremely severe."  She described asthmatics as "walking time bombs" because you cannot predict "when something is going to set the airways into a constrictive episode where they need some emergency care."  She stated that it was possible for a child to have an asthma attack that could not be controlled with a inhaler, perhaps requiring a child to be treated using a nebulizer or even hospitalization.  When questioned about the refill history for Alexander's inhaler, Dr. Belcher opined that "the child was not under control," but she also indicated that she could determine the purpose of a refill—whether Alexander needed a refill because he used the inhaler or he lost an inhaler.  This evidence establishes that Alexander had severe asthma and that he required an inhaler, but it does not raise a fact question about whether Alexander's breathing was substantially impaired because it does not show that Alexander's physical activities were restricted.  Dr. Belcher's testimony does not contradict defendants' summary judgment evidence showing that Alexander's breathing permitted him to participate in a wide range of physical activities.

Dr. Estrada first saw Alexander in 1992; he last saw Alexander in November 2002—10 months before Alexander died.  Dr. Estrada explained that he saw Alexander when he was sick.  When questioned about whether Alexander was able to participate in physical education, Dr. Estrada testified that Alexander was able to participate in physical education during the 2002/2003 school year, but he did not have an opinion about the 2003/2004 school year because

he had not seen Alexander since November 2002.  He explained that he allowed his student

patients to participate in physical education class because he wanted them to feel as normal as

possible.  When questioned about the nature of asthma, Dr. Estrada explained that even an

asthmatic who had had no symptoms for two years could have an asthma attack "out of the blue."

He testified that if an asthmatic "is at the wrong place at the wrong time[,] you just never know

what is going to happen."  When asked to review the refill history for Alexander's inhaler, Dr.

Estrada characterized the refill history as "pretty frequent," and indicated that had he known that

Alexander was refilling his inhaler so frequently, he would have wanted to know why Alexander

was using the inhaler; that is, he would have wanted to know if Alexander was using the inhaler

for exercise or if he was having problems.  This evidence establishes that Alexander suffered

from a very unpredictable medical condition, but it does not raise a fact question about whether

Alexander's breathing was substantially limited.  Like Dr. Belcher's testimony, Dr. Estrada's

testimony does not contradict defendants' summary judgment evidence showing that Alexander's

breathing permitted him to participate in a wide range of physical activities.

The testimony by Dr. Belcher and Dr. Estrada establishes that Alexander had a physical

impairment.  But under *Sutton*, a physical impairment does not equal disability.  To be disabled

under *Sutton*, a person's physical impairment must substantially limit a major life activity.  Here,

the summary judgment evidence does not show that Alexander's physical impairment—

asthma—substantially impaired his breathing.  Consequently, the defendants are entitled to

summary judgment on plaintiffs' Section 504 claim.

In addition to arguing that no evidence exists to show that Alexander was disabled,

defendants also argue that no evidence exists that NISD refused to provide Alexander with

reasonable accommodations.  Having concluded that no evidence of disability exists, I did not

consider this argument.  If the District Court chooses not to enter summary judgment in favor of

defendants on plaintiffs' Section 504 case, I will review the summary judgment evidence for

evidence of discrimination.

### Plaintiffs' Negligence Claims against Wilson

Defendants also ask the District Court to reconsider its earlier determination that the

exhaustion requirement set out in Section 22.0514 of the Texas Education Code does not apply

to plaintiffs' negligence claims against Wilson.[32]  Defendants have included their exhaustion

argument in their motion for summary judgment.  Defendants maintain that the District Court

lacks jurisdiction over the negligence claims because plaintiffs failed to pursue the school's

administrative remedies prior to filing their lawsuit.  Defendants rely on excerpts from the

school's policy outlining the rights and responsibilities of students and parents to grieve

particular complaints and summary judgment evidence showing that Alexander's parents never

filed a grievance under the school policy.

Section 22.0514 provides that "[a] person may not file suit against a professional

employee of a school district unless the person has exhausted the remedies provided by the

school district for resolving the complaint."[33]  Previously, I explained that under Texas law,

exhaustion of any available administrative remedies is a prerequisite to the trial court's

jurisdiction.[34]  I also explained that a person is excepted from this jurisdictional requirement if

---

[32]*See* docket entry # 57.

[33]TEX. EDUC. CODE ANN. § 22.0514 (Vernon 2006).

[34]*See* docket entry # 48 at p. 16-17.

the available administrative remedies are inadequate.[35]  I determined that the exhaustion

requirement set out in Section 22.0514 did not apply because the procedures in FNG(LOCAL),

GF(LOCAL), and the student handbook did not apply to plaintiffs' claims against Wilson.[36]  I

opined as follows:

> The dispute presented in this case is neither a "grievance" or "complaint" as
> anticipated by these procedures. . . . [T]he procedures . . . anticipate resolution of
> a "student-related" matter in need of corrective action or in which there is an
> ongoing dispute.  At the time defendants allege plaintiffs should have begun the
> review process of any negligence claim against Nurse Wilson, Alexander was
> deceased.  The administrative procedures applicable to a "grievance" or
> "complaint" would have been ineffectual under these circumstances because they
> do not provide any remedy applicable to a claim premised on death of a student.[37]

The District Court accepted this basis for denying defendants' motion to dismiss the claims

against Wilson.[38]

In addition, the District Court determined that Section  22.0514's exhaustion requirement

did not apply because the complained-about conduct predated the effective date of the governing

provision.[39]  I recommend the District Court reconsider that aspect of its earlier order because the

statute of limitations became effective on September 1, 2003 and part of the complained-about

conduct occurred after that date.  If the statute applied, it would apply to claims arising from the

time period September 1, 2003—the day the statute became effective to September 16,

---

[35]*Id*. at p. 16.

[36]*Id*. at p. 17-18.

[37]*Id*. at p. 18.

[38]*See* docket entry # 56.

[39]*See id*.

21

2003—the day Alexander died, but it would not apply to claims arising from the time period

August 23, 2003—the day Catherine enrolled Alexander in O'Connor High School—to August

30, 2003—the day before the effective date of the statute.  Even though some of the plaintiffs'

allegations arise after the effective date of the statute, there is another reason the statute does not

apply: the inadequacy of the school's administrative procedures.

In their motion for summary judgment, defendants do not specifically address my earlier

rationale about why the school's procedures do not apply to plaintiffs' claims.  Instead, they state

that a "narrow reading of the policies and their applicability is not supported by the plain

language of the policies submitted and serves to frustrate many of the legislative and public

policies that give rise to the requirement of exhaustion of administrative remedies . . ."

Defendants also argue that plaintiffs have failed to meet their burden of showing that the school

board would not have the authority to provide some of the relief plaintiffs seek.  The plaintiffs,

however, have advanced a compelling argument about why the school's administrative

procedures are inadequate.  Previously, they argued as follows:

> Simply stated, Alexander Garcia is deceased.  He cannot participate in any such
> proceedings.  There is no amount of medical services, accommodation,
> compensatory education, policy amendments, or other administrative action that
> can undo or mitigate the facts presented by this civil action.  Having endured the
> loss of their son, to what purpose do Defendants suggest that Oscar and Catherine
> Garcia be forced to endure a process that can provide no appropriate remedy?[40]

I can think of no administrative response that could address plaintiffs' negligence claims.  As a

result, I stand by my original recommendation that defendants' motion to dismiss plaintiffs'

negligence claims be denied on grounds that the school's administrative procedures are

---

[40]Docket entry # 8 at ¶ 17.

inadequate to address plaintiffs' negligence claims.

If the District Court accepts the recommendations in this memorandum, only plaintiffs' state-law negligence claims will remain in this case.  A federal court may decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction . . . ."[41]  Although federal courts ordinarily decline to exercise jurisdiction over pendent state-law claims when "all federal claims are dismissed or otherwise eliminated from a case prior to trial," this general rule is neither mandatory nor absolute.[42] Where the resolution of all other claims comes late in an action and substantial judicial resources have already been expended in the case, declining to exercise supplemental jurisdiction may be inappropriate.[43]  In determining whether to exercise supplemental jurisdiction, "a federal court should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims."[44]  In this case, these factors weigh in favor of exercising supplemental jurisdiction even though all federal claims have been resolved.

This case has been pending for almost two years.  The parties have taken several depositions and the case has progressed to the advanced stages of litigation with little left to do

---

[41]28 U.S.C. § 1367(c)(3).

[42]*Batiste v. Island Records*, 179 F.3d 217, 227 (5th Cir. 1999).

[43]*See Batist*e, 179 F.3d at 227 (determining that the district court erred by declining to exercise supplemental jurisdiction over the plaintiffs' state law claim where the case  had been pending in the district court for almost three years and the trial was scheduled to begin one month later; the appellate court found that "the factors of judicial economy, convenience, and fairness to the parties" required the district court to continue with the state law claim).

[44]*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988).

before trial.[45]   The Court has devoted many hours to reviewing the parties' pleadings, the attached exhibits and the record in this case; researching the legal issues involved; and resolving a variety of motions—three motions to dismiss, two motions for summary judgment, and motions to resolve several discovery disputes.[46]  Thus, the District Court has substantial familiarity with the merits of the case.  Dismissing plaintiffs' negligence claims would require plaintiffs' to file in state court and require a state court to duplicate much of the work that the District Court has already done.  In addition, plaintiffs' negligence claims present no novel or complex question of state law,[47] they arise from the same set of facts as the claims which gave the District Court original jurisdiction, and no compelling reason exists for declining jurisdiction.[48]  Thus, I conclude that the judicial resources expended to date weigh in favor of exercising supplemental jurisdiction over plaintiffs' negligence claims.

### Recommendation

Based on my analysis of the summary judgment evidence, I recommend the District Court GRANT defendants' motion for summary judgment  (docket entry # 60) on plaintiffs' Section 504 claim and enter summary judgment in favor of defendants on that claim.  I also recommend that the District Court GRANT defendants motion to reconsider (docket entry # 58), reconsider

---

[45]The parties have asked for additional discovery as discovery has been restricted to this point.

[46]*See Smith v. Amedisys*, 298 F.3d 434, 447 (5th Cir. 2002) (using the same reasoning and reaching the same conclusion).

[47]*See* 28 U.S.C. § 1367(c)(1) (listing reasons the district court can decline to exercise supplemental jurisdiction over a state-law claim).

[48]*See* 28 U.S.C. § 1367(c)(4) (explaining that the district court can decline to exercise supplemental jurisdiction over a state-law claim in exceptional circumstances).

24

its earlier determination that Section 22.0514 does not apply to any of the plaintiffs' allegations, and DENY the defendants' motion to dismiss plaintiffs' negligence claims against Wilson (docket entry # 60).

There are also two motions to amend the scheduling order pending in this case.  Those motions proposed changes in certain dates set out in the scheduling order.  Because many of those dates have passed while the motion for summary judgment has been pending, I DENY those motions  (docket entry #s 54 & 90) as moot and DIRECT the parties to submit a joint proposed revised scheduling order, as appropriate, after they have reviewed this memorandum and my recommendations and within 15 days after the District Court has ruled on defendants' motion for summary judgment.

### Instructions for Service and Notice of Right to Appeal/Object

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties who have entered an appearance, by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[49] **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**   A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or

---

[49]28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[50]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[51]

     **SIGNED** on January 3, 2007.

*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[50]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[51]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).